## LEE STEWART v. TERRITORY.

No. 2205, Okla T.   Opinion Filed February 20, 1909.

(100 Pac. 47.)

1.  ASSAULT WITH INTENT TO KILL—Deadly Weapon—Indictment—Sufficiency. Where an indictment charges that an assault and battery was committed with a deadly weapon, it is not necessary to go further, and allege in the indictment that the means or force used was likely to produce death.

2.  INSTRUCTIONS—Assuming Facts. When a fact is proven by the testimony of both the prosecution and the defense, and there is no conflict in the evidence with reference to it, the court in the instructions may treat it as an admitted fact in the case.

3.  SAME—Estoppel of Party Complaining. When an instruction is applicable to the testimony of the defendant, he cannot be heard to complain that it assumes as true statements which were made by him while on the witness stand.

4.  ASSAULT WITH INTENT TO KILL—Deadly Weapon—Evidence—Sufficiency. For facts supporting a verdict of guilty of an assault with a deadly weapon, see opinion.

(Syllabus by the Court.)

*Appeal from District Court, Kingfisher County; John H. Burford, Judge.*

Lee Stewart was convicted of an assault and battery with a deadly weapon, and he appeals.   Affirmed.

The defendant was found guilty of an assault and battery with a deadly weapon, and his punishment was assessed at six months' confinement in the penitentiary. He prosecuted an appeal, and the case is regularly before us.

*Noffsinger & Hinch,* for appellant.

*E. G. Spilman,* Asst. Atty. Gen., for the Territory.

FURMAN, PRESIDING JUDGE. First. The defendant assails the sufficiency of the indictment upon the ground that it did not allege that the assault committed by the defendant with the pistol was in a manner likely to produce death. The charging part of the indictment is as follows:

"That Lee Stewart, late of the county aforesaid, on the fourteenth day of May, in the year of our Lord one thousand nine hundred and five, in the county of Kingfisher, and territory of Oklahoma, aforesaid, with force and arms, in and upon one Fred L. Cordis, in the peace of the territory of Oklahoma then and there being, wilfully, feloniously, and from a deliberate and premeditated design to effect the death of the said Fred L. Cordis, did make an assault, and the said Lee Stewart, then and there, wilfully, unlawfully, feloniously, and from a deliberate and premeditated design to effect the death of the said Fred L. Cordis, did strike at, towards, against, and upon the head of the said Fred L. Cordis, with a certain deadly weapon, to wit, a pistol, commonly called a revolver, then and there had in the hand of the said Lee Stewart, and the said Lee Stewart, with the pistol, commonly called revolver aforesaid, by the stroke aforesaid, him, the said Lee Stewart, there and then feloniously, wilfully, and with a deliberate and premeditated design to effect the death of the said Fred L. Cordis, did cut, and wound, giving unto him, the said Fred L. Cordis, then and there, with the pistol, commonly called a revolver, aforesaid, by the cutting and wounding aforesaid, by the said Lee Stewart, in and upon the head of the said Fred L. Cordis, one wound of the length of two inches of the breadth of one inch and of the depth of one-half of one inch. Contrary to the form of the statute in such case made and provided, and against the peace and dignity of the territory of Oklahoma."

This indictment was drawn under Wilson's Rev. & Ann. St. 1903, § 2206, which is as follows:

"(2206) No. 287. Every person who intentionally and wrongfully shoots, shoots at, or attempts to shoot at another, with any kind of fire-arms, air-gun, or other means whatever, with intent to kill any person, or who commits any assault and battery upon another by means of any deadly weapon, or by such other means or force as is likely to produce death or in resisting the execution of any legal process, is punishable by imprisonment in the Territorial prison not exceeding ten years."

If the assault had been alleged to have been made by any other means or force than with a deadly weapon, then it would have been necessary to have made the further allegation that such an assault was likely to produce death to have brought the act within the statute. But, when an assault is alleged to have been made with a deadly weapon, it is not necessary to go further under this statute, and allege that it was likely to produce death. We therefore find that there was no error in the action of the trial court in sustaining the indictment.

Second. Defendant complains of the following instruction given by the court to the jury:

"A deadly weapon is any instrument, which, when used upon a human being in the manner the evidence shows the pistol was used in this case, is reasonably likely to produce a wound or wounds from which death may reasonably be expected to result."

The objection is that the instruction assumes material facts of which there is no evidence. If the record sustained this contention, or if there was a conflict in the evidence upon this question, the objection would be well founded. It is true that there is a conflict in the evidence as to how the difficulty began, but there is no conflict in the evidence as to the manner in which the pistol was used or as to the effect of such use. The complainant testified as follows:

"He [defendant] came in there where I was, and got me by the arm and said 'I want to see you out doors,' and then I went to the middle of this room, and there was a large crowd in there, and, when I got in there about the middle, I said, 'I don't want to go out there, and, if you have anything to say to me, say it in here,' and he did not say anything, but reached in here and pulled

2 Cr.—5

out a gun and hit me over the head, and as quick as he pulled his gun I tried to get away, but he knocked me down—I guess he knocked me down, I don't know really—but I know I was down on the floor after he hit me and I tried to get away."

The defendant testified as to the use of the gun as follows: "Q. You hit him with the gun? A. Yes. Q. He was standing up? A. Yes · Q. · Did you knock him down? A. I don't know whether I hit him hard enough to knock him down, but he fell down. Q. He fell down the same time you hit him? A. About that time."

The physician who attended on the complainant testified that he had three or four bad wounds upon his head, which penetrated to the bone, which were evidently made with a blunt instrument. The instruction given as to the manner of the use of the pistol was responsive to the testimony of the defendant as well as to the testimony of the prosecution. In view of the testimony of the defendant himself, the court was authorized to treat it as an admitted fact that the defendant had knocked the complainant down by a blow upon the head with the pistol. Counsel for the defense complain of the instruction given upon the ground that it assumed that the pistol was a deadly weapon as a matter of law, and that it took from the jury the right to determine this matter as a question of fact. The instruction complained of is not susceptible of this construction. After charging upon the manner of the use of the pistol, which was an admitted fact, the court further instructed the jury that such manner of use must have been likely to produce a wound or wounds from which death might reasonably be expected to result. This was the test submitted to the jury as to whether the pistol was a deadly weapon. The determination of this question was left to the jury without suggestion from the court. We think that the instruction given is not as full and clear as it should have been, but, in view of the facts of this case, we do not feel that we would be authorized in disturbing the verdict on account of this instruction.

Third. The counsel for the defendant complain of the following instruction given to the jury:

"An assault and battery is not unlawful when committed by a person in resisting or in attempting to prevent an offense upon his person, provided he uses no more force than is reasonably necessary to protect himself. And in this case, if at the time Stewart struck Cordis, it was apparent to Stewart from some hostile act or demonstration of Cordis that Cordis was about to commit an assault upon his person, and he in good faith believed, and had good grounds to believe, that Cordis was in the act of doing him some bodily harm, and that it was necessary for his own safety from injury to strike Cordis, then under such circumstances the striking of Cordis by Stewart would be justifiable on the grounds of self-defense. But if Stewart struck Cordis in self-defense, and yet if, after Cordis had quit the fight and showed a purpose to abandon the fight, Stewart continued to beat, wound, and bruise Cordis with the pistol, then such excessive use of violence would constitute an unlawful assault and battery, and, if the gun or pistol with which he struck Cordis' was when used to club or strike a person with a weapon which was when used in such manner likely to produce wounds from which death might reasonably be expected to result, then such offense would be assault and battery with a deadly weapon. Excepted to by the defendant and exception allowed. Jno. H. Burford, Judge."

The only part of this instruction of which defendant's counsel complain is the following: "But, if Stewart struck Cordis in self-defense, and yet, if, after Cordis had quit the fight and showed a purpose to abandon the fight, Stewart continued to beat," etc. The objection to this instruction is that it assumes that Cordis had quit the fight. This is an undisputed fact in the case. The defendant himself testified that he struck Cordis at least one blow after Cordis was down, and when the defendant was in no possible danger from him. A number of other witnesses, who are uncontradicted, testified that the defendant struck Cordis a number of blows over the head with the pistol when Cordis was on his hands and knees, crawling away from the defendant. To our minds the record discloses a most aggravated case against the defendant. The evidence shows that on the night of the 14th of May, 1905, a dance was given at the residence of George Miller, in Kingfisher county; that the complainant, Cordis, had been

requested by Mrs. Miller to act as floor manager; that the defendant and some others came to the dance after 12 o'clock at night; that the defendant had been drinking, and came armed with a pistol    A dispute arose between   the defendant and Cordis, the merits of which are immaterial.   In addition to the testimony of Cordis, hereinbefore quoted, he further testified that after the defendant had knocked him down he tried to get away from the defendant by crawling off on his hands and knees, and that while he was doing this the defendant followed him up and continued to beat him on the head with the pistol.   He also testified that it was a large pistol with which defendant struck him.

L. G. Roles testified as follows:

"A.   The first I seen was Cordis was down and on his hands and knees, and Lee Stewart standing over him, or kind of in front of him, hitting him over the head with a six shooter.   Q. Where was he hitting him?   A.   On the back of the head.   Q. How many times did you see him hit him?   A.   I think five or six times.   Q.   What was Cordis doing?   A.   Was not doing anything but crawling across the floor.   Q.   Trying to get away? A.   Yes; seems to me he got out of the room where I first seen him hit him, and crawled to the other room."

Mrs. George Miller testified:

"Q.   Did you see the fight that occurred between Lee Stewart and Cordis?   A.   I did not see any fight, but I seen him hitting him on top of the head with a gun.   Q.   Who?   A.   Mr. Stewart was hitting Mr. Cordis with a gun on top of the head.   Q. Where was you?   A.   I was in the east room.   Q.   Mr. Cordis in that room?   A.   Mr. Cordis and Stewart was in the west room. Q.   Did they come in that room?   A.   He crawled in on his hands and knees, and I seen Mr. Stewart hitting him with a gun on top of the head as he crawled in on his knees and hands.   Q. Was Stewart standing up?   A.   Yes.   Q.   Did you see Mr. Cordis after this was over?   A.   Yes.   Q.   What was his condition?   A. He was all covered with blood, and I got clean cloths for him to wrap his head in, and they took him to a doctor."

Ed Martin testified as follows:

"Q.   State what you seen?   A.   The first I seen Cordis was on the floor, crawling on his hands and knees, and Stewart was

beating him over the head with a gun. Q. How many times did you see Stewart hit him? A. Could not say how many times, several times. Q. Did you see Mr. Cordis after the beating? A. I seen him right away after the beating; yes. Q. State to the jury the condition he was in A. Well, I don't know what condition he was in, only I seen the blood. Q. He was bleeding, was he? A. Yes. Q. How much? A. Oh, I could not say. Q: Was it running down his clothes? A. Yes. Q. More than one place? A. I could not say I just seen blood running down. Q. What was the attitude of Cordis when you first seen the fight, what attitude was Cordis in? A. He was trying to get away, and was crawling on his hands and knees. Trying to get into the other room. Q. Was he at any time during the time you seen him trying to strike back at Mr. Stewart? A. I did not see him until after he was on the floor. Q. He was on his hands and knees, crawling away? A. Yes. Q. What was Mr. Stewart doing? A Following him up hitting him over the head with a gun."

Joe Best testified as follows:

"A. I seen Stewart hitting Cordis. Q. Hitting him with what? A. A gun. Q. What condition was the parties in when you seen them? A. Mr. Cordis was on the floor on his hands and knees, and Mr. Stewart was hitting him over the head. Q. How many times did Mr. Stewart hit him over the head? A. Two or three times. Q. What was Cordis trying to do? A. He was trying to crawl away. Q. What was Stewart doing? A. He seemed to be following him up. Q. What was he doing when he was following him up? A. Hitting him. Q. Following him up and hitting him? A. Yes, sir Q. What kind of a revolver did Stewart have? A. I could not say. I did not have the gun in my hands. Q. You did not have hold of the gun? A. No, sir. Q. You seen it was a revolver? A. Yes, sir."

The most of the testimony of the defendant related to the merits of the quarrel between defendant and Cordis which we regard as immaterial to the merits of this case. Omitting irrelevant matters, the defendant testified that he wanted to talk to Cordis about the difference between them, and that he requested him to go out of the house. Defendant then testified as follows:

"A. He just started right to the door, and he stopped and I took him by the arm and I said, 'Come on out, I want to talk

to you,' and he said, 'By God, I will not go no place with you,' and then he took a smash at and tried to knock me down, and I guess he would have if I had not broke the lock. Q. State what you did. A. That started the fight. Q. Tell the jury what you did. A. Well, we went to fighting, and I got the best of it; that is all there is to it. Q. Did you have a gun with you? A. Yes, sir. Q. Did you use a gun on him? A. Yes, sir. Q. How many times did you strike him with it? A. I don't think I hit him but once or twice, but I had to do that to keep him from whipping me. That is all there was to it."

On cross-examination the defendant further testified:

"Q. Did you follow Mr. Cordis into the kitchen, according to these witnesses? A. Yes, sir. Q. Followed him into the kitchen? A. I let him go out, was not bothering him any. Q. You walked in with him? A. I walked behind him. Q. Did you help him up? A. No, sir. Q. Did you hit him to keep him down? A. I may have hit him once after he was down."

In the light of the other testimony in the record and in view of this admission from the defendant, he is in no condition to complain of the instruction given. When Cordis declined to go out of the house with the defendant, he had no right to seize Cordis by the arm and attempt to force Cordis to go with him. This was an assault and justified Cordis in using force to prevent being compelled to leave the house, where he had a right to be. The defendant was without the shadow of a right to draw his pistol and strike Cordis on the head with it, and knock him down as though he were a brute. According to defendant's own testimony, he is guilty of the offense charged. The defense in this case has been purely technical from beginning to end. It reflects great credit upon the ability of the counsel who conducted it, but it is without substantial merit. By the express terms of our statute, we are prohibited from reversing a conviction upon any technicality or exception which does not affect the substantial rights of the defendant. The verdict rendered is the only verdict that could be arrived at upon the defendant's own testimony by an impartial and intelligent jury. The people of this state have the right to assemble in a peaceable manner for social enjoyment

or for other proper purposes. They should be protected by the courts in the quiet and undisturbed exercise of this right. The man who goes to such a meeting under the influence of intoxicating liquor, armed with a pistol, and who for a fancied or a real grievance, converts the meeting from one of pleasure into a scene of violence of bloodshed and of terror should be severely punished. The sooner such men learn that this kind of conduct will not be tolerated for a single moment in Oklahoma, the better it will be for them and for the peace and well-being of society. The defendant has cause to congratulate himself upon the extreme leniency of the judge in assessing his punishment at only six months' confinement in the penitentiary. The blow which defendant struck on the head of Cordis was with such force that Cordis was not only knocked to the floor, but was unable to stand up, and was compelled to crawl upon his hands and knees, like a brute, in his efforts to escape. During this time defendant was pursuing him and repeating the blows, which penetrated to the skull. It is almost a miracle that Cordis was not killed. If this had happened, the defendant would doubtless now be under a sentence for murder, which we would have affirmed upon the record before us.

The judgment of the lower court is affirmed.

BAKER and DOYLE, JUDGES, concur.

---

ON MOTION FOR REHEARING.

Denied June 23, 1909.

(102 Pac. 649.)

1. **APPEAL—Rehearing.** On motion for rehearing, this court will not consider questions which were waived on the original submission of the cause.

2. **SAME—Waiver of Errors—Allegations too General.** Where the brief of appellant simply complains of rulings of the trial court as being erroneous, but does not support this general statement

with argument and the citation of authority when possible, this court is not required to examine the record in search of prejudicial errors, but will treat such general allegations as a waiver of the alleged errors.

3.   . **WORDS AND PHRASES—"Brief."** A "brief" is a written presentation of the question involved in a forensic controversy, and of the matters of fact and of law which demand investigation.

(Syllabus by the Court.)

*W. M. Hinch*, for appellant.

*Charles L. Moore*, Asst. Atty. Gen., for the Territory.

PER CURIAM. The motion for a rehearing in this case is based upon alleged irregularities in the manner in which the grand jury was drawn, which presented the indictment. This matter was not presented in the original brief, except in the most general terms. No attempt was made to point out any irregularities. No argument was made, and no authorities were cited or discussed. This court has repeatedly declared that it is the duty of counsel, in presenting their cases upon appeal, to place their fingers upon the place that hurts, and clearly point out the special error complained of, and show that it was prejudicial to their clients. Unless this is done, the alleged errors will be treated as waived. Our views upon this question are ably presented by Mr. Justice Dunn in *Ferguson et al. v. Union National Bank*, 23 Okla. —, 99 Pac. 641.

Speaking of the brief filed in that case by the appellant, Justice Dunn says:

"This document, omitting the caption and signature, is less than a page in length, and is merely a recitation and statement of the things which counsel contends took place in the court below, followed by a statement that the court erred in ruling on certain of these matters, in addition stating that the presiding judge before whom the case was tried was not the judge of the district, and had no jurisdiction to try the cause. No authorities are cited in support of any of the propositions stated; neither is any argument presented to sustain them, nor any effort whatever made, other than the simple statement mentioned, to show that error was committed. This is not such a brief as is contem-

plated should be filed in a case by counsel in support of a petition in error in this court; and, while we would probably not dismiss the petition in error on such a brief of our own motion, yet when the question is squarely raised and presented, as it is in this case, by a motion on the part of the defendant in error to dismiss the petition in error for want of a sufficient brief, we cannot ignore the rights of such movant by failing to consider its motion, or, if found to be well taken, deny it, especially where no motion is made to supplement the purported brief filed.

"The Supreme Court of the territory of Oklahoma in the case of *Penny v. Fellner,* 6 Okla. 386, 50 Pac. 123, had this to say with reference to the requirements expected of a party filing a brief in this court: 'This court will not examine the record filed herein in search of prejudicial errors which are not clearly pointed out and insisted upon in the brief of the complaining party, but all such errors (if any) will be considered as waived.' The standard authority on procedure in appellate courts, entitled 'Appellate Procedure,' by Elliott, at section 438, defines a brief, as understood under our system, as follows: 'A brief is a written presentation of the questions involved in a forensic controversy, and of the matters of fact and of law which demand investigation. The primary object is to convey information to the court, and this cannot be done without clearly stating the manner in which the controverted points arise, the facts which constitute the ground-work of the legal dispute, and the governing propositions of law. A subsidiary object is to convince the court where the law and justice of the case lie. In every well-prepared brief will be found a concise and clear statement of the manner in which the questions arise, a succinct and methodical statement of the facts, and a perspicuous array of arguments and authorities.' Its requirements are set out in sections 444 and 445, as follows: 'It is essential that all points be made in the brief, and properly made; if not so made they are waived. * * * It is not enough to assert in general terms that a ruling of the trial court is wrong; a fair effort must be made to prove that it is wrong or the point will not be considered as having been made. Counsel cannot make a point in an appellate tribunal by a naked general assertion, for such an assertion will not be heeded. * * * But, in order to secure so much as notice of the point stated they must support it by a fair effort, adducing arguments and, if they can, citing authorities. A bare designation of a ruling as

erroneous, without discussion, is not sufficient to entitle counsel to successfully insist that he has made a point. * * * Where a ruling is asserted to be erroneous the party making the assertion must overcome the presumption that it was correct, and this he cannot do otherwise than by specifying the particular error which invalidates the ruling.. This rule is required for the assistance and enlightenment of the court. Common fairness to opposing counsel likewise demands it, for they have a right to know just what particular point they are to meet. It is also required by the analogous cases which declare that objections wherever presented must be specific.'

"From the foregoing it will be readily seen that the so-called brief filed in this case in no particular meets the requirements, and the motion of the defendant in error to dismiss the petition in error is accordingly sustained."

Ordinarily errors waived in the original submission of a cause cannot be reviewed upon a motion for rehearing. No reasons are given why this should be done in the case at bar.

The motion for a rehearing is therefore denied.