190 P.2d 501

## STATE v. CASSADY.

No. 983.

Supreme Court of Arizona.

March 1, 1948.

Earl Platt, of St. Johns, for appellant.

M. V. Gibbons, Co. Atty., of St. Johns, for appellee.

LA PRADE, Justice.

This is an appeal from a judgment and sentence after a verdict finding the defendant-appellant guilty of a conspiracy to violate the statute making it a misdemeanor to operate a gaming device known as a slot machine. The information charged the defendant with four counts of conspiracy. The material portions of the third count read as follows:

"That Defendant, R. W. Cassady, on or about the 20th day of November, 1946, and before the filing of this Information at and in the County of Apache, State of Arizona, did then and there commit the crime of conspiracy, a felony, committed as follows, to-wit:

"That during all the times mentioned in this Information one R. E. Rockwell was the owner and operator of what is known as the 'Old Stage Station', situated adjacent to U. S. Highway No. 66, in Apache County, Arizona.

"That on or about the date last aforesaid, Defendant, R. W. Cassady did then and there wilfully, unlawfully and feloniously agree, and conspire with the said R. E. Rockwell to operate and conduct within said 'Old Stage Station' certain gaming by means of devices commonly known as slot

machines; in violation of Section 43-2701, Arizona Code Annotated, 1939.

"That thereafter and on or about the said 20th day of November, 1946, Defendant R. W. Cassady and the said R. E. Rockwell in furtherance of, and pursuant to said conspiracy did operate two slot machines in violation of the statute aforesaid and Defendant, R. W. Cassady did periodically and on or about the date last aforesaid, and at the place above named, take from said slot machines so operated by Defendant R. W. Cassady and said R. E. Rockwell, various and sundry sums of money; the exact sums and amounts being to the County Attorney unknown, which said sums of money when so taken from said slot machines were divided between Defendant, R. W. Cassady and the said R. E. Rockwell on a 40-60 basis; Defendant taking 60% and said R. E. Rockwell retaining 40%.

"In violation of Section 43-1101, Arizona Code Annotated, 1939."

Counts 1, 2, and 4 were of similar tenor. In count 1 defendant was alleged to have conspired with one A. J. Berry; in count 2 with Bertha Riggs. Count 4 was quashed at the time of arraignment.

At the close of the state's case, defendant moved for a directed verdict as to counts 1, 2, and 3 upon the ground that there had been no testimony other than that of co-conspirators and that it had not been corroborated. After the court had indicated to counsel its inclination to grant the motion, the state moved the court for permission to reopen its case, which was granted over the objection of defendant. After the state had rested its case for the second time, defendant, again renewed his motion for a directed verdict, which was granted as to count 1, upon the ground and for the reason that there had been no proof offered to corroborate the testimony of the co-conspirator Berry, and denied as to counts 2 and 3. The order of the court granting defendant's motion for a directed verdict of acquittal on count 1 was made in the presence of the jury, but the court did not at that time submit, and require the jury to return, a verdict of not guilty. The not-guilty verdict was not submitted to the jury until after it had returned a verdict of not guilty on count 2 and a guilty verdict on count 3.

The co-conspirator Rockwell testified that he purchased his place of business in March, 1943, at which time he acquired with the business a slot machine. At this point his testimony goes as follows:

"Q. And later did you get some more machines? A. No, sir, I was running my own machines and later after I opened up the place I had to put in Mr. Cassady's.

"Q. Why? A. The Sheriff said he would rather one man would handle all of the machines. Therefore Mr. Cassady had been to my place and the Sheriff came and so I let Mr. Cassady handle them.

"Q. How many machines did he bring to your place? A. One at first.

"Q. And later? A. Brought another one.

"Q. And then you had two machines that were brought there by Mr. Cassady, is that correct? A. That is correct." (Emphasis supplied.)

He testified further that during all of this time the machines were repaired by defendant Cassady; that money was continuously gambled into them by the traveling public; that defendant came about every two weeks and removed the money constituting the machine's winnings, leaving 40% to the witness and taking the other 60%; and that at each time defendant removed the money from the machines he left a written memorandum indicating the amount of the take and its division. With reference to this division the witness testified as follows:

"Mr. Greer: This division of the money as appears in these exhibits, when did you first divide the proceeds from the slot machines? A. We started dividing as soon as he put the machines in my place in '43. We started the same division and carried it all of the way through.

\* \* \* \* \* \*

"Mr. Greer: Did you at some time, Mr. Rockwell, have a conversation with Mr. Cassady as to the manner you would divide the money from the slot machines, just answer yes or no? A. No, sir.

"Q. Was there any statement made by him when the slot machines were put into your place? A. Yes, sir.

"Q. When was that? \* \* \* A. '43, yes, sir. \* \* \*

"Q. What was said at that time? \* \* \* A. He said he would take 60% and leave me 40%.

"Q. Who was to operate them? A. Mr. Cassady.

"Q. Where were they to be left? A. At my place of business.

"Q. Was that arrangement carried through until you ceased operation? A. That is right, yes, sir. \* \* \*

"Q. Who had the keys to the machines? A. For the first, I will say, six or seven months Mr. Cassady after he and I *agreed* to put the machines in he carried the keys and then he turned them over to me later; but he carried them for quite a while because I *refused* to take them.

"Q. How long did he have the keys? A. Two and a half years and maybe more, sir, I don't remember." (Emphasis supplied.)

The witness again testified with reference to the date when the machines were installed by defendant, as follows:

"Q. And at that time did you testify that he *told you on what basis you would divide the money from them?* A. I did.

"Q. And is that the *basis you used in operation?* A. That is right." (Emphasis supplied.)

Mrs. Rockwell, wife of the alleged co-conspirator R. E. Rockwell, admittedly a

co-conspirator but not charged, testified to the same effect, and in addition identified six checks that she had given to defendant Cassady made payable to him and identified by her as indorsed by him, which checks were given to Cassady for purchase of change. These checks were admitted in evidence over the objection of defendant, his objection being that she was permitted to testify as to the contents of the documents before they were admitted in evidence. In identifying the documents she explained that oftentimes it was convenient to purchase change from defendant at the time he came to empty the machines, it being necessary to have change available for customers who desired to gamble money into the machines.

As above indicated the court did not rule on the motion for a directed verdict when first made, but permitted the state to open its case and proceed further. The state then called a witness, one Noel Tiffin, who testified that for some months prior to November, 1946, he had been employed by the Rockwells as a mechanic on a commission basis; that on three different occasions he had talked with Cassady at the Rockwell's place of business; and at the time of each of these conversations he had watched Cassady check the machines, remove the money therefrom, and "give Mr. Rockwell part of it, or he received a check for his part." Neither the name of Mrs. Rockwell nor Tiffin was indorsed upon the information at the time these witnesses were called and permitted to testify. The defendant objected to the competency of their testimony upon the ground that their names had not been indorsed upon the information (as required by section 44-759), but made no application to the court to have the names of the witnesses indorsed on the information. The county attorney at that time disclosed to the court that he had on the previous day furnished counsel for defendant with the names of these witnesses. Upon this showing the court overruled the objection and permitted the witnesses to testify. Prior to testimony of these witnesses, counsel requested a recess to permit him to *examine* these witnesses, which request was denied. The court advised counsel that if at the close of their testimony it appeared that defendant needed a recess to meet the testimony the same would be granted. The rule is that "No continuance shall be allowed because of the failure to indorse any of the said names unless such application was made at the earliest opportunity and then only if a continuance is necessary in the interest of justice." No further request was made for a recess or continuance. A person whose name is not indorsed is not absolutely disqualified from being a witness.

" * * * Should a witness be called whose name is not endorsed on the information, the defendant cannot be heard to complain if he does not announce surprise and is not able to convince the court that in view of all the circumstances it would be unjust to compel him to proceed in

his defense. * * *" State v. King, 66 Ariz. 42, 182 P.2d 915, 919. It is apparent that the defendant was in no manner surprised and was deprived of no substantial right.

Defendant's first assignment of error reads as follows:

"The Court erred in refusing to rule upon Appellant's Motion for a directed verdict of acquittal at the close of the State's case; and, likewise, erred in permitting the State to reopen its case without ruling upon Appellant's motion, which had theretofore been made, for the following reasons:

"(a) A motion was pending before the court for a directed verdict of acquittal, prior to the time the State's motion to permit it to re-open its case was made. The Court should not have proceeded until it had ruled on the motion for a directed verdict.

"(b) That Appellant's motion for a directed verdict should have been granted, for the reasons that the State had wholly failed to prove the essential elements of a conspiracy, and the evidence was wholly insufficient to sustain a verdict of 'Guilty'. When assuming the State had made some proof of the existence of a conspiracy, such proof was made by the sole and uncorroborated evidence of an alleged co-conspirator or accomplice."

Defendant in support of the first portion of this assignment contends that the court was compelled to direct the jury to acquit him at the time he made his first motion for a directed verdict, that is, when the state first closed its case. He bases this contention upon section 44-1835, A. C.A.1939, which reads:

"*Directing acquittal of defendant.*—If, at the close of the evidence for the state or at close of all the evidence in the cause, the court is of the opinion that the evidence is insufficient [insufficient] to warrant a conviction, it may, and on the motion of the defendant *shall,* direct the jury to acquit the defendant." (Emphasis supplied.)

We believe that the court in the exercise of a sound legal discretion was authorized to permit the state to reopen the case and submit further proof. By not ruling on the motion it cannot be said that by implication the court denied it. By permitting the state to reopen its case the only inference that can be drawn is that the motion was good as the proof then stood. After the state had finally concluded its testimony the court should then have ruled upon the motion. In the instant case counsel for defendant, out of a sense of caution, again renewed the motion, which was denied.

The new rules of criminal procedure are an integral part of the penal code of this state. By section 43-102, it is provided:

"* * * the rule of the common law that penal statutes are to be strictly con-

strued, has no application to this Code; its provisions are to be construed according to the fair import of their terms, with a view to effect its object and to promote justice. * * *"

We think that this rule of construction with reference to penal statutes is likewise applicable to the rules of criminal procedure. If the interpretation of the rule contended for by defendant was correct, then the court would be compelled to direct a verdict in favor of defendant where the state had inadvertently neglected to prove venue, which on a reopening could be established in a very few words. We pointed out in State v. Hendricks, 66 Ariz. 235, 186 P.2d 943, 946, that:

"* * * Statutes must be construed as to the fair import of their terms. Our statute on attempted bribery of public officials, sec. 43-1702, though a part of the Penal Code is likewise subject to fair and not strict construction, * * *."

Our rules of criminal procedure should be construed so as to promote justice—not to thwart it. To have refused to permit the state to reopen its case would have been an abuse of legal discretion and an "assist" to the obstruction of justice.

■ In support of the second portion of assignment of error 1, and of assignment of error 4 reading as follows:

"That the Court erred in admitting the testimony and declarations of co-conspirators and evidence of other alleged offenses, over Appellant's objection, prior to establishing a prima facie case on Count No. 3, for the reason that a prima facie case must first be made by the State on the offense or offenses charged, before it is permissible to offer evidence of other offenses and declarations and acts of alleged co-conspirators."

defendant submits that it is the law that a conspiracy should first be established prima facie before the acts and declarations of a co-conspirator can be admitted in evidence. In support of this proposition of law defendant relies on section 44-1835, heretofore quoted at length. As additional authority he cites Territory v. Turner, 4 Ariz. 290, 37 P. 368, 369, wherein the court said:

"* * * It is said to be a rule of ancient standing that the conspiracy should be first established, prima facie, before the acts and declarations of a co-conspirator can be admitted in evidence against another. * * *"

The court then pointed out that the proving of overt acts alone would not be sufficient to convict, saying:

"* * * It is primarily necessary to prove the corrupt agreement, and then such overt act. * * *"

No one would contend that the mere proof of an actual commission of a criminal act by two or more persons is sufficient in itself to justify the conclusion that a conspiracy has been formed prior thereto by the same parties to commit the particular offense in question. When this court said

that it is a "rule of ancient standing that the conspiracy should be first established, prima facie, before the acts and declarations of a co-conspirator can be admitted in evidence against another," we do not believe that it intended to convey the idea that this was the inexorable rule. No authority was cited for the statement. The general rule then and now is that proof of the existence of a conspiracy ordinarily should precede any proof of the acts or declarations of the co-conspirators of the accused. But the rule in this respect is not absolute and unyielding. 22 C.J.S., Criminal Law, § 757, citing cases from numerous jurisdictions. It is a matter resting in the sound discretion of the trial court to permit a departure from the strict order of proof. The following dissertation on the subject is typical of the expressions found in countless cases:

" * * * It is not material at what particular time any one entered into the conspiracy. It is enough to know that he was a common conspirator. The acts or declarations of one or more of the conspirators are sometimes admitted before sufficient proof is given of the conspiracy. This rests, however, largely within the discretion of the trial court, but the proper connection must be subsequently made, so as to show prima facie a conspiracy between all, before such acts or declarations will ultimately be permitted to go to the jury. Such is the course pursued in the present case. A conspiracy may be proven by showing the declarations, acts, and conduct of the conspirators. It is seldom possible to establish a specific understanding by direct agreement between the parties to effect or accomplish an unlawful purpose. Usually, therefore, the evidence must be necessarily circumstantial in character, and will be sufficient, if it leads to the conviction that such a combination in fact existed. * * *" State v. Ryan, 47 Or. 338, 82 P. 703, 705, 1 L.R.A.,N.S., 862.

■ Most conspiracies comparable to the one in the instant case are not formulated and agreed upon in the presence of witnesses, nor are they reduced to writing with fine print on the back of the agreement. This conspiracy was agreed to between the co-conspirator Rockwell and the defendant some years before the date charged in the information, and was a continuing conspiracy as long as any overt acts were performed in furtherance thereof. United States v. Kissell, 218 U.S. 601, 31 S.Ct. 124, 54 L.Ed. 1168; Brown v. Elliott, 225 U.S. 392, 32 S.Ct. 812, 56 L.Ed. 1136. That a conspiracy had been formed to violate the gaming laws as charged in the information was not self-evident by evidence other than that of the accomplice until the overt acts had been performed which then evidenced a strong inference of the fact that a conspiracy existed. The testimony of witness Noel Tiffin, who was in no manner connected with the alleged offense, compels the inference that a conspiracy did

exist. If there had not been some agreement and understanding between defendant and Rockwell, by what right or authority could defendant have been in Rockwell's place of business, checking machines and removing money therefrom, regardless of who owned the machines. The witness testified that he saw defendant open the machines and give to Rockwell part of the money in them, and that defendant took "his part" or received a check for it. This testimony that defendant received "his part" may have been a conclusion of the witness, but it stands uncontradicted and unexplained except insofar as it is self-explanatory. Counsel for defendant did not see fit to cross-examine the witness as to his knowledge of any agreement or understanding between defendant and Rockwell as to what would be Rockwell's "part" or what would be defendant's "part." Where a conspiracy must be proved, if at all, by circumstantial evidence necessitating showing a large number of apparently independent acts and circumstances, any objections with respect to the competency of the evidence at the time when it was offered is obviated by the subsequent introduction of evidence establishing the conspiracy and thus rendering it competent. The very existence of a conspiracy is generally a matter of inference deduced from certain acts of persons accused which are committed in pursuance of an apparently criminal or unlawful purpose in common to them. 11 Am.Jur., Conspiracy, section 38, citing cases.

Pertinent to these assignments of error 1 and 4 it is logical at this time to consider the sufficiency of the corroboration of the accomplice. The rule is stated in section 44-1819 as follows:

"Corroboration of accomplice.—A conviction can not be had on the testimony of an accomplice, unless he is corroborated by other evidence which, in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense, or the circumstances thereof."

This rule has been interpreted by this court in numerous cases. See "Notes to Decisions" following the code section. In Reynolds v. State, 14 Ariz. 302, 127 P. 731, 732, this court quoted approvingly from the case of People v. Ames, 39 Cal. 403, as follows:

The corroborating evidence must, of itself, and without the aid of the testimony of the accomplice, tend, in some degree, to connect the defendant with the commission of the offense. It need not, of course, be sufficient to establish his guilt, for, in that event, the testimony of the accomplice would not be needed. But it must tend in some slight degree at least, to implicate the defendant. The purpose of the statutes was to prohibit a conviction unless there was some evidence, entirely exclusive of that of the accomplice [which, of itself, and without the aid of the accom-

plice, tended] to raise at least a suspicion of the guilt of the accused."

This statement was again quoted with approval in Leverton v. State, 23 Ariz. 482, 205 P. 321.

■ The testimony of Noel Tiffin examined in the light of these interpretations of the rule requiring corroboration "by other evidence which, in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense, * * *" amply meets the requirements of the rule. Tiffin saw the conspiracy consummated. Tiffin's testimony, standing alone, justified the jury in inferring that a conspiracy existed between the defendant and Rockwell. Rockwell's testimony is replete with declarations of the formation and existence of the conspiracy. His testimony is that they had an "understanding"; that it was "agreed" (after the sheriff had made a few suggestions to him) that defendant would install the machines and keep them in repair; that Rockwell would make them available to the public; that they were played; and that it was agreed that Rockwell would take 40% and defendant 60% of the "take." The defendant in a businesslike manner left his written receipts showing the division of the "load." One of the receipts indicated that the "load" was $133 and that the share to the "house" was $53.20. The receipts in evidence are mute evidence furnished by defendant. Tiffin corroborated the division. Defendant's

indorsement on checks given to purchase change is more silent evidence corroborating defendant's connection with the conspiracy and proclaiming his membership as an active participant in the unlawful and corrupt agreement to violate the gaming laws. A conspiracy and overt acts to effect its object were alleged and proved.

■ Defendant's second assignment of error complains of the court's ruling permitting the introduction, over objection, of certain complaints and informations filed by the county attorney charging others than defendant with gambling and attempted bribery. Counsel for defendant on cross-examination of the state's witnesses had elicited answers indicating that the county attorney had been derelict in his duty, and inferring that the prosecution against defendant was not justified in view of the fact that gambling had run rampant in the county for years to the knowledge and with the tacit if not actual consent of its enforcement officers. The county attorney, Mr. M. V. Gibbons, considered that the cross-examination of the state's witnesses had been made to discredit him and show that he had "winked" at gambling after becoming county attorney on January 1, 1947. To offset these aspersions he offered in evidence the complaints and informations referred to, which he thought exculpated him from any inferences of "winking" at illegal gambling.

The cross-examination and the exhibits should not have been admitted in evidence

for the reason that they were incompetent, irrelevant, and immaterial, and had no tendency to prove the guilt of this defendant. The county attorney was not on trial and neither the inducement for the proof nor the proof itself should have been admitted. With reference to this situation the court properly instructed the jury as follows:

"* * * if you believe from the evidence in this case that no other person has been charged or is being prosecuted for violating the gaming laws, of this State, such fact, if it be a fact, does not concern this Jury; your sole duty in this case is to determine the guilt or innocence of the Defendant under the evidence adduced in this cause, under the instructions which I have given you."

We do not believe that admission of the documents was in anywise prejudicial to the rights of defendant, and error, if any, was invited by the tactics of defense counsel who cannot now be heard to complain.

█ Another assignment of error complains of the procedure adopted by the trial court in failing forthwith to direct the jury to return a verdict of not guilty on count 1 of the information at the time it granted defendant's motion for a directed verdict on count 1. By the rule contained in section 44-1835, supra, the court on motion of defendant "shall" direct the jury to acquit the defendant if, at the close of the state's case or at the close of all of the evidence in the cause, the court is of the opinion that the evidence is insufficient to warrant a conviction. The procedure adopted by the court was irregular but did not violate any substantial rights of defendant. The motion for a directed verdict on count 1 was made in the presence of the jury and granted in the presence of the jury. The instructions all went to counts 2 and 3, and forms of verdict submitted were limited to counts 2 and 3. The error in procedure was not prejudicial to the rights of defendant.

█ Appellant also assigns error on the part of the court in compelling the state's witness Charles Stafford to give testimony tending to incriminate him and appellant in the operation of slot machines after the witness had claimed his constitutional immunity against giving self-incriminating evidence. The constitutional provision is section 10, article 2, and reads:

"No person shall be compelled in any criminal case to give evidence against himself, or be twice put in jeopardy for the same offense."

There is no merit to this assignment for the reason that the privilege against incrimination is personal to the witness, and the accused is not entitled to have such evidence excluded which is claimed to have incriminated the witness. Wigmore on Evidence, vol. VIII, Third Ed., sections 2196 and 2270; 28 R.C.L. section 12, p. 427. To this point is People v. Leavitt, 127 Cal.App. 394, 15 P.2d 894, where it is said:

" \* \* \* The privilege of not testifying where the answers may have a tendency to incriminate is one that is personal to the witness, and in which the defendant has no voice. If the witness had testified fully without complaint, the appellant could not be heard to complain."

▮ Defendant complains of the ruling of the trial court permitting the witness Irene Rockwell to testify, prior to the admission of the documents in evidence, as to the contents of checks that she had given to defendant in purchase of change. The witness was shown the exhibits; identified them as being in her handwriting; testified that the payee named therein was the defendant; and identified the indorsement as the signature of defendant. Their relevancy and competency could not have been determined without her explanation as to the reason for the giving of the checks and connecting the transaction with the issue then before the court. There is no merit in the assignment.

▮ The giving of the following instruction is assigned as error:

"The words 'Conduct and operate' as used in the Information in this case are applicable to all persons cooperating, assisting in or carrying on gaming in violation of the Statute by the court as read to you.

"They apply to one who controls the establishment and procures. or permits illegal gaming games to be carried on therein or to one who engages in the illegal use of the premises and thus aids in conducting, carrying on and operating gaming games or furnishes gaming devices or equipment with the knowledge and intent that gaming shall be carried on by use thereof.

"If therefore, from the evidence you find beyond a reasonable doubt, that Defendant, R. W. Cassady agreed and conspired with one or more or all of the parties named in the two counts of the Information in this cause, to conduct gaming upon the premises described in Counts 2 and 3 of the Information and that in furtherance of said agreement, Defendant placed or left slot machines upon the premises described in the Information with the intent and purpose that the several persons named in said Count 2 and 3 of the Information should conduct, carry on, or permit gambling upon said premises and that said persons did conduct or permit gaming by the means and in the manner set forth in the Information, and if you further find beyond a reasonable doubt that the Defendant did receive from time to time a portion of the money acquired through the operation of slot machines as in the Information set forth, then it is your duty to find the Defendant guilty."

Defendant criticizes the instruction contending that it is a comment on the evidence in violation of section 12, article 6

of the Arizona Constitution and sections 44-1838 and 44-1840, A.C.A.1939. The constitutional provision reads:

"Charge to jury.—Judges shall not charge juries with respect to matters of fact nor comment thereon, but shall declare the law. * * *"

The code sections read:

"44-1838. Function of court and jury.—All questions of law shall be decided by the court and all questions of fact by the jury, except as provided in section 214 (§ 44-1011). The jurors shall apply to the facts the law as given to them by the court."

"44-1840. Charge of court to jury.—(1) The court shall instruct the jury regarding the law applicable to the facts of the cause. * * *"

The defendant was charged with a conspiracy to violate section 43-2701 wherein prohibited gaming is defined. The section reads as follows:

"Conducting gaming — Participating therein—Penalty.—Every person who shall deal, carry on, or open, or cause to be opened, or who shall conduct, either as owner, proprietor or employee, whether for hire or not, any game of * * *, and every slot machine, punchboard or machine of like character, whether the same be played for money, checks, credits or any other representative of value within the state of Arizona; and every person who shall participate in any of the above-enumerated games dealt, carried on or opened or caused to be opened by any other person in the state of Arizona, shall be guilty of a misdemeanor, * * *."

The court in its instructions read to the jury the sections just quoted. Specifically appellant's criticism of the first two paragraphs of the instruction is stated by him as follows:

" * * * the court might just as well have said the words "Conduct and Operate", as used in the Information, apply to the Defendant in this case, and certainly could have left no other inference with the jury than that it was the feeling of the court that the Defendant was guilty."

In this contention we cannot concur. The first two paragraphs complained of are not susceptible of defendant's interpretation. We construe these two paragraphs to be nothing other than abstract definitions of the words "conduct and operate" in their context.

Defendant insists that the third paragraph of the instruction constitutes a charge with respect to matters of fact and a comment on the evidence. He says:

"The Instruction makes no effort to give the law applicable to any facts, and *under no condition could it be an instruction on the law relative to the facts or the case.* * * *" (Emphasis supplied.)
and

" * * * for the further reason that the Appellant could not be guilty as

charged, even assuming the facts set forth in said instruction were true."

In support of these propositions appellant cites from Engle v. State, 53 Ariz. 458, 90 P.2d 988, 993, wherein this court said:

" * * * But as we have said, gambling per se is not prohibited by our law. It is only certain specified forms of gambling that are forbidden, and it is only the keepers of houses wherein these particular forms are carried on who are punished by the provisions of Article 9, supra. Defendants, therefore, could not have been punished under that article for conducting the business described in the information."

Our attention is also directed to the statement of this court in State v. LeNoir, 60 Ariz. 57, 130 P.2d 1037, 1039, wherein this language appears:

" * * * The law is directed against the keeper, owner or operator of such games and his employees. We think the whole context of the law indicates the above as the legislative intent. * * *"

In the Engle case, defendant had been convicted of maintaining a type of public nuisance, the punishment for which was not otherwise prescribed. The first question the court had to determine was whether the acts set up in the information fell within the definition of a public nuisance, and, second, whether they were punishable by any other provision of the law. The first question was answered in the affirmative; the second in the negative. In

reaching the conclusion that it was not a prohibited type of gambling, the court used the language above quoted.

In the instant case the type of gambling found to exist, i. e., conducting and operating slot machines, is prohibited by law. To all intents and purposes defendant was the owner of the machines. He brought them to Rockwell's place of business and installed them with the consent of Rockwell after reaching an agreement as to what each of them was to do and how they would split the "take." Defendant falls squarely within the definition of the crime contained in section 43-2701. He was the owner of the machines and caused the game (slot machines) to be opened and conducted. It was not necessary that he be the proprietor of the establishment in order to be guilty of the simple offense of operating slot machines. In any event defendant as an accessory became a principal under section 43-116, which in part provides:

"The parties to crimes are classified as principals and accessories. All persons concerned in the commission of a crime, whether it be a felony or misdemeanor, and whether they directly commit the act constituting the offense, or aid and abet in its commission, or, not being present have advised and encouraged its commission, * * * are principals in any crime so committed. * * *"

See State v. Carter, 66 Ariz. 12, 182 P. 2d 90.

In support of defendant's contention that the instruction charged the jury with respect to matters of fact and commented thereon, he calls our attention to the holdings of this court in Stephens v. State, 20 Ariz. 37, 176 P. 579, and Lujan v. State, 16 Ariz. 123, 141 P. 706. These cases do not substantiate the contention of appellant but rather thoroughly demonstrate that the instruction complained of did not charge the jury with respect to matters of fact nor comment thereon.

In the Stephens case, supra, the defendant was convicted of first degree murder, his defense being temporary insanity. The judgment was reversed for the reason that the court's instructions were comments on the evidence. This was self-evident from a reading of the instructions. The jury was, in effect, told that even though defendant manifested nervousness and emotion before the homicide, this could be discounted if the jury also found from the evidence that later in the day he attended to his business affairs normally and rationally. The court also commented upon the fact that no predisposing cause of insanity had been shown, and that no expert witness had testified directly as to a belief in his insanity.

In the Lujan case, defendant had been convicted of grand larceny; the circumstances of the case conclusively showed a larcenous intent. The all-important question was: "Who killed the cow?" The court instructed the jury as follows:

"The intent with which the defendant committed the act complained of must be determined by you * * *."

The defendant had denied killing the cow, but the court's instruction assumed that he had committed the act complained of, and the court so stated its opinion to the jury.

The instruction complained of contains no such comments or presumptions. The court in its instructions repeatedly cautioned the jury that the defendant could not be convicted unless it was believed beyond a reasonable doubt from the evidence that the allegations of the information had been established. The instructions must be considered as a whole and no case will be reversed because of some isolated paragraph or portion of an instruction which, standing alone, might be misleading. Tate v. State, 56 Ariz. 194, 106 P.2d 487. This instruction again left it up to the jury to determine from all of the evidence whether defendant had agreed and conspired with the persons named in counts 2 and 3 of the information; and whether, in furtherance of the agreement, he had placed or left slot machines upon the premises of Rockwell with the intent that Rockwell should conduct and carry on gambling with machines; and further required the jury to find beyond a reasonable doubt that Cassady had received a portion of the money from the machines, before it could convict. This latter requirement was more favorable to defend-

ant than he was entitled to. The overt acts charged in the information were that he had operated two slot machines at Rockwell's place of business; that he periodically appeared at the place of business and took money from the machines; and that the money was divided 60-40. A conviction could have been secured on proof of the conspiracy, and proof of any one of the overt acts. People v. Tavormina, 257 N.Y. 84, 177 N.E. 317, 75 A.L.R. 1405. If the jury believed that he formed a conspiracy with Rockwell and placed the machines in Rockwell's place of business to effect the purpose of the conspiracy, that would have been sufficient.

The court's instruction did not assume the existence of any facts. Even if the instruction were susceptible to the interpretation contended for by defendant, it would not have been in violation of the constitutional provision precluding a comment on the evidence. The state's evidence had been incontrovertibly proved and was wholly undisputed. In Lujan v. State, supra [16 Ariz. 123, 141 P. 709], this court said:

"Where a fact is incontrovertibly proved and wholly undisputed, there exists no reason prohibiting the court from so stating in the instruction given. In People v. Putnam, 129 Cal. 258, 61 P. 961, the rule is stated: 'An instruction which assumes a fact as proved will not warrant a reversal if the fact is admitted, or there is no shadow of conflict of evidence with respect to

it.' Stewart v. Territory, 2 Okl.Cr. 63, 100 P. 47 [102 P. 649]; Bartell v. State, 4 Okl. Cr. 135, 111 P. 669; State v. Watson, 47 Or. 543, 85 P. 336."

We have meticulously read and studied the entire record, from which study we conclude that such errors of procedure as were committed were inconsequential and in no wise prejudiced the substantial rights of defendant. Accordingly the judgment is affirmed.

STANFORD, C. J., and UDALL, J., concur.