543 P.2d 461

The STATE of Arizona, Appellee,

v.

Lyle John SPEERSCHNEIDER, Appellant.

No. 1 CA–CR 722.

Court of Appeals of Arizona,
Division 1,
Department A.

Dec. 9, 1975.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, Cleon M. Duke, Asst.Attys. Gen., Phoenix, for appellee.

Derickson & Kemper by James Hamilton Kemper, Phoenix, for appellant.

## OPINION

OGG, Presiding Judge.

Appellant was convicted by a jury of possession of marijuana for sale. The trial court subsequently entered judgment on the verdict. The imposition of sentence was suspended for five years, and the appellant was placed on probation for that period of time. Appellant appeals from the judgment of guilt. He argues on appeal that:

1. The court committed reversible error in admitting hearsay testimony under the co-conspirator exception to the hearsay rule;

2. The admission of an unavailable, co-conspirator's declaration under the co-conspirator exception to the hearsay rule denied appellant his constitutional right to confront the witnesses against him.

The defendant/appellant, Lyle John Speerschneider, argues that the admission of certain testimony, over the objection that it constituted hearsay, was error. The questions giving rise to the objection were:

"Q. And did you see Joel at that time and location?

A. Yes, I did.

Q. And did he say anything to you?

A. He indicated at this time that he did not have the pound sample and did not have the marijuana. He said that his connection at this time was expecting around five hundred pounds of marijuana to be delivered at this time. He also gave me the name and address of his connection.

Q. What was that name?"

[After the court overruled the objection of defense counsel the witness was allowed to answer.]

"A. This Joel said his connection's name was John."

\* \* \* \* \* \*

"Q. And did you speak with anyone at that time?

A. Yes, I did. I spoke with Joel.

Q. And what, if anything, did he say then?

A. He advised me again that the marijuana was not in yet and that he was going over that evening to his connection's house to spend the night and he would know more on the following morning, which would be the 15th of January, and gave me a phone number to call.

Q. What did he say was the number of his connection's house?"

[After the court overruled the objection of defense counsel, the following question and answer were given:]

"Q. What was the number?

A. 266–1101."

Defendant argues that both of the foregoing questions clearly called for hearsay since they required the officer to testify to statements made to him by the declarant. He argues that the co-conspirator exception to the hearsay rule was not applicable because there was no independent evidence to establish a conspiracy.

A review of the record discloses that the following evidence was developed at defendant's trial.

On the morning of December 13, 1974, Officer Blake purchased marijuana from the occupant of a residence immediately behind the alleged co-conspirator's residence. When Officer Blake informed the occupant of his desire to purchase greater quantities of marijuana the occupant asked him to wait while she went to Yensen's residence. A short time later Yensen, the alleged co-conspirator and declarant, arrived and discussed the possibility of selling over one hundred pounds of marijuana to Officer Blake. He stated that he did not presently have that amount, but that he could obtain as much as Officer Blake wanted.

Subsequent to the initial contact with Yensen on December 13, Officer Blake had numerous conversations with him regarding the expected arrival of the marijuana. Yensen continued to encourage Officer Blake by representations and promises of expected deliveries. During a phone conversation with Yensen on December 17, Officer Blake was told that the marijuana earmarked for Officer Blake had been sold over the weekend. Officer Blake was also told to call later in the evening because Yensen was in the middle of closing two more deals at the time. When he called later that evening, he was told that a shipment was coming in the next day and to meet Yensen at a particular bowling alley in order to purchase a one-pound sample.

Officer Blake met Yensen at the bowling alley on December 18, but was told to proceed to Yensen's home rather than make a deal in the parking lot. After they had arrived at the house, Yensen went into another room and conversed with an unseen, unidentified male. Returning to the room occupied by Officer Blake and another officer, Yensen told them the shipment was in and they could make the deal that day. They agreed that the deal should be made at a motel room, which was to be obtained by Officer Blake.

When Yensen was late in arriving at the motel, Officer Blake called a telephone number given him by Yensen, which defendant admitted was his phone number. When the phone was answered, Officer Blake said "John?" The voice on the other end said "Yeah. Is this Lee?" (This was the name used by Officer Blake.) Certainly, it can be inferred that the person was familiar with the Officer's pending business with Yensen since the phone call was in close proximity to the time the deal was supposed to go through. John told Officer Blake that Yensen had left shortly before and he would be there with the marijuana at any time. Seven to ten minutes later Yensen arrived. Yensen then made a phone call, part of which was over-

heard by Officer Blake. In that part Yensen was heard to say "Everything is cool. I got the eight thousand. Bring the rest of the stuff down." John then arrived at the motel and helped carry the rest of the marijuana into the room. In a conversation with one of the officers, who mentioned that the weights written on the packages were pretty close to the actual weights, defendant stated "Yeah, they should be, we weighed them on a . . . ." (some type of weighing device; the officer couldn't remember the exact word used). The defendant himself admitted that his phone number was the one called by Officer Blake on December 18 and he was the only "John" who lived at that address. A notebook found on the defendant contained notations such as: "Monday, Joel, three pounds, $75 paid;" "Tuesday, Tom, three pounds," and below that, "Joel 25 and Phil 15." The notebook also contained the address of the motel where the deal was made.

■ It is beyond dispute that before extrajudicial statements of an alleged co-conspirator can be admitted into evidence against another as an exception to the hearsay rule, the existence of the conspiracy must be established prima facie. *Territory v. Turner,* 4 Ariz. 290, 37 P. 368 (1894); *State v. Cassady,* 67 Ariz. 48, 190 P.2d 501 (1948); *State v. Thompson,* 273 Minn. 1, 139 N.W.2d 490 (1966) cert. den. 385 U.S. 817, 87 S.Ct. 39, 17 L.Ed.2d 56 (1967). As stated by the Court in *State v. Thompson,* supra:

"The term 'prima facie' in this context is rather a nebulous one that defies exact definition. It can probably be defined only in terms of sufficient evidence to permit the trial court reasonably to infer that there existed a conspiracy." 139 N.W.2d at 503.

■ While proof of the existence of a conspiracy ordinarily should precede proof of the declarations of the co-conspirators, wide latitude is given the trial courts in determining the order of proof. *State v. Cassady, supra; State v. Webb,* 19 Ariz. App. 73, 504 P.2d 1296 (1973); *State v. Thompson, supra.*

■ We think that a review of the complete record leads to the conclusion that the trial court could reasonably have inferred that there had been a prima facie showing of a conspiracy. The evidence, together with all reasonable inferences which might be drawn therefrom, constituted sufficient foundational proof of a conspiracy to permit the introduction of statements made by the declarant Yensen to Officer Blake. We agree with the statement in *State v. Thompson, supra,* where the Court, faced with a similar question, said:

"Where an examination of the record as a whole shows facts from which the trial court could reasonably infer the existence of a conspiracy, the case ought not to be reversed because proof of the conspiracy came at the wrong time." 139 N.W.2d at 503.

Having thus determined that the evidence was properly admitted as an exception to the hearsay rule, we next address appellant's claim that such admission violated his constitutional right to confront the witness against him, i. e., the declarant Yensen. Yensen, when examined in chambers prior to being called to the stand, invoked the privilege against self-incrimination. Consequently, he was not called as a witness.

■ While the Confrontation Clause guarantees a defendant the right to confront witnesses against him, the Supreme Court has concluded that the admission of hearsay does not necessarily violate the Sixth Amendment right to confrontation. *Dutton v. Evans,* 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970). The Sixth Amendment right to confrontation is made applicable to the states through the Fourteenth Amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

When hearsay evidence is admitted under recognized exceptions, the Confrontation Clause interest in "bringing out the truth"

may be satisfied without cross-examination because certain underlying rationales are thought to assure reliability. Davenport, *The Confrontation Clause and the Co-Conspirator Exception in Criminal Prosecutions: A Functional Analysis.* 85 Harvard Law Review 1378 at 1382 (1972). It has been noted that while numerous exceptions to the hearsay rule, such as spontaneous or excited utterances, learned treatises and declarations against interest, rest on a theory that the excepted hearsay by its very nature "contains special guarantees of reliability lacking in hearsay generally, the co-conspirator exception has usually been supported by a variety of theories unrelated to the trustworthiness of the evidence itself." Davenport, id at 1384. These theories have included: (1) agency, i. e., the admission of one as that of each; (2) characterization of the statements as "acts;" and (3) the need for lax rules of evidence for prosecution of such secret crimes.

The Court in *Dutton v. Evans, supra,* suggested in reviewing the constitutionality of a Georgia co-conspirator exception to the hearsay rule which allowed the admission of statements made after the object of the conspiracy had been completed, that, absent sufficient assurances of reliability, the only permissible guarantee of a hearsay declaration's evidentiary value was the defendant's cross-examination of the declarant. This suggestion was foreshadowed by the Court's earlier decision in *California v. Green,* 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). The Court's decision in *Green* clearly put an end to any easy conclusion that evidence admitted under a recognized exception to the hearsay rule, *ipso facto,* satisfied the constitutional command of the Constitutional Clause. The Court stated:

"While it may readily be conceded that hearsay rules and the Confrontation Clause are generally designed to protect similar values, it is quite a different thing to suggest that the overlap is complete and that the Confrontation Clause is nothing more or less than a codification of the rules of hearsay and their exceptions as they existed historically at common law. Our decisions have never established such a congruence; indeed, we have more than once found a violation of confrontation values even though the statements in issue were admitted under an arguably recognized hearsay exception." 399 U.S. 155, 156, 90 S.Ct. 1933.

While the Court in *Green* dealt with the admission of statements by a declarant who was present at trial, it commented on the admission of statements where the declarant was not available. The Court said:

"The concern of most of our cases has been focused on precisely the opposite situation—situations where statements have been admitted in the absence of the declarant and without any chance to cross-examine him at trial. These situations have arisen through application of a number of traditional 'exceptions' to the hearsay rule, which permit the introduction of evidence despite the absence of the declarant usually on the theory that the evidence possesses other indicia of 'reliability' and is incapable of being admitted, despite good-faith efforts of the State, in any way that will secure confrontation with the declarant. Such exceptions, dispensing altogether with the literal right to 'confrontation' and cross-examination, have been subjected to careful scrutiny by this Court." 399 U.S. at 161, 162, 90 S.Ct. at 1936.

Our co-conspirator exception parallels that used in the federal courts. *Compare, Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949) (Jackson, J., concurring); *with State v. Sullivan,* 68 Ariz. 81, 88, 200 P.2d 346 (1948). Unlike the Georgia co-conspirator exception reviewed in *Dutton,* which allowed the admission of statements made after the object of the conspiracy had been completed, both the federal and Arizona ex-

ceptions apply only to statements made in furtherance of the conspiracy and *during its continuance*. However, there is a disagreement in the federal circuits as to the meaning to be attached to the following language found in *Dutton v. Evans, supra:*

"Appellee does not challenge and we do not question the validity of the co-conspirator exception applied in the federal courts." 400 U.S. at 80, 91 S.Ct. at 215.

Several circuits have concluded that because the Court in *Dutton* dealt with a hearsay exception *broader* than that found in the federal rule, the Court, in the above quote, was stamping the federal rule with its sanction of constitutionality. *See, Ottomano v. United States,* 468 F.2d 269 (1st Cir. 1972), cert. den. 409 U.S. 1128, 93 S.Ct. 948, 35 L.Ed.2d 260 ("The federal co-conspirator rule . . . does not violate the confrontation clause"); *United States v. Clayton,* 450 F.2d 16 (1st Cir. 1971); *United States v. Weber,* 437 F.2d 327 (3rd Cir. 1970) cert. den., 402 U.S. 932, 91 S.Ct. 1524, 28 L.Ed.2d 867 (1971). (However, the case gives an extended discussion to circumstances surrounding the statement which "present the traditional hallmarks of reliability." 437 F.2d at 340). However, other circuits have rejected the notion that the Confrontation Clause is satisfied simply because a statement is admitted pursuant to the federal co-conspirator exception. *United States v. Puco,* 476 F.2d 1099 (2nd Cir. 1973); *United States v. Adams,* 446 F.2d 681 (9th Cir. 1971); *Arias v. United States,* 388 F.Supp. 736 (D.C.Cal.1975). The Fifth Circuit, recognizing that a conflict does exist, declined to place its support behind either view in *United States v. Menichino,* 497 F.2d 935 (5th Cir. 1974). This is certainly a dilemma which may ultimately have to be resolved by the United States Supreme Court. However, in view of the important constitutional rights protected by the Sixth Amendment, we think the rule in those circuits which requires careful scrutiny of statements admitted under any co-conspira-

tor exception to the hearsay rule to be the more persuasive.

The Supreme Court in *Dutton* was careful to state:

" . . . this Court has never indicated that the limited contours of the hearsay exception in federal conspiracy trials are required by the Sixth Amendment's Confrontation Clause . . . It is clear that the limited scope of the hearsay exception in federal conspiracy trials is a product, not of the Sixth Amendment, but of the Court's 'disfavor' of 'attempts to broaden the already pervasive and wide-sweeping nets of conspiracy prosecutions.'" [Citations omitted]. 400 U.S. at 82, 91 S.Ct. at 216.

We think that this language clearly leaves open the question of whether statements offered under the shield of the hearsay exception in federal conspiracy trials, by that fact alone, comply with the Sixth Amendment's guarantee of the right to confront witnesses. It appears inconsistent to argue that the limitations placed on the federal co-conspirator exception may be interpreted as a guarantee that statements admitted under that exception assure that " 'the trier of fact [has] a satisfactory basis for evaluating the truth of the prior statement.' " *Dutton v. Evans,* 400 U.S. at 89, 91 S.Ct. at 220. As the Court suggested in *Dutton,* the limitations result from the .Court's "disfavor" with an already pervasive and widesweeping prosecutorial tool, not from an attempt to reconcile it with the Sixth Amendment's Confrontation Clause.

▮▮▮ We think that the necessary conclusion that must be reached in light of the recent Supreme Court pronouncements in this area, is that a co-conspirator hearsay exception, when applied to statements made by "unavailable" declarants, conflicts with the Sixth Amendment's Confrontation Clause. However, given appropriate circumstances assuring their "reliability" statements made by such declarants are ad-

missible, notwithstanding the denial of a literal right to confrontation.[1] We cannot dispute that statements made during the "cover-up" or concealment phase of a conspiracy, as considered in *Dutton,* may be more likely to be fabricated and unreliable than those made during the "pendency" of a conspiracy. Nevertheless, we are reluctant to accept as infallible the proposition that co-conspirator declarations made during the pendency and in furtherance of the conspiracy are by that fact alone reliable. We think that the Supreme Court's decisions reflect a considered attempt to reconcile the Sixth Amendment's right to confrontation with the hearsay rule. Exceptions to the hearsay rule which by their nature "dispense with the literal right to 'confrontation' must be subjected to careful scrutiny so that the trier of fact is afforded a satisfactory basis for evaluating the truth of the statement." *Arias v. United States, supra.*

Applying the above analysis to the case at bar, we find that the facts surrounding the declarations tended, as did those in *United States v. Puco, supra,* to negate any motive to falsify the statements. The facts in *United States v. Puco, supra,* were very similar to those before this Court. Here, as in *Puco,* the declarant had no reason to suspect that Officer Blake was other than a potential purchaser. As noted at the beginning of this opinion, Officer Blake met Yensen on the morning he purchased marijuana from the occupant of a house which was located behind Yensen's. While at the house making the purchase, Officer Blake told the occupant of his desire to purchase a larger quantity. The occupant told Officer Blake to wait while he summoned Yensen. Yensen came back to the house and discussed the possibility of

a purchase of marijuana with Officer Blake. Yensen undoubtedly believed Blake to be merely an "innocent" purchaser, not a police officer. Thus, Yensen's voluntary disclosure of his source was presumably not tainted by any motive to falsify the identification. Furthermore, there was no reasonable possibility of error in the identification since "John" did show up at the motel at the time of the purchase; indicated he knew of his own personal knowledge that the weights on the packages of marijuana were correct; stated that he was "John" when his phone number was dialed by Officer Blake shortly before the sale, at which time "John" informed him that Yensen had just left with the marijuana. In addition to Yensen's disclosure of his "connection's" phone number, appellant testified at trial and gave his phone number and stated he was the only "John" residing at the house with that number. The numbers were the same.

In view of all these circumstances, the statements made by Yensen were reliable. Appellant had a complete opportunity to cross-examine Officer Blake, who was under oath and whose demeanor, ability to recollect, perceive and truthfully relate what he had heard was evaluated by the trier of fact. Under such conditions, Officer Blake was a reliable informant not only as to what he saw but as to what he heard. *Dutton v. Evans, supra.*

We hold that under the circumstances of this case, there were sufficient indicia of reliability so that the trier of fact was afforded a satisfactory basis for evaluating the truth of the statements.

The judgment and sentence are affirmed.

FROEB and DONOFRIO, JJ., concur.

1. Since we do not view the statements admitted here as "crucial" to the prosecutor's case or "devastating" to the defense, we need not decide the implication of that language found in *Dutton v. Evans,* 400 U.S. 74, 87, 91 S.Ct. 210, 219, 27 L.Ed.2d 213, 226 (1970). See generally Davenport, 85 Harvard Law Review 1378 at 1382; see also cases cited in text and *U. S. v. Burke,* 495 F.2d 1226 (5th Cir. 1974).